**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICHOLAS CLOUSER, | : | CIVIL ACTION NO. 1:21-CV-1148 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| HANOVER FOODS CORPORATION | : | |
| and STEPHANIE KLEINFELTER, | : | |
| ESQUIRE, | : | |
| | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Nicholas Clouser alleges 14 statutory claims against his former

employers, Hanover Foods Corporation and its general counsel Stephanie

Kleinfelter, Esquire pursuant to Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq*.; the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq*.; the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et

seq*.; and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS.

STAT. ANN. § 951 *et seq*.  Clouser also brings two common-law claims for wrongful

discharge in violation of Pennsylvania public policy.  Hanover and Kleinfelter

(collectively, "defendants") move to dismiss 13 of the 16 claims pursuant to Federal

Rule of Civil Procedure 12(b)(6).  We will grant in part and deny in part the motion.

**I.     Factual Background & Procedural History**

Clouser worked for Hanover from March 2017 through March 2021 in several

different positions, including human resource assistant, human resource

representative, and digital marketing administrator.  (See Doc. 1 ¶ 6).  Kleinfelter

acted as Hanover's general counsel in the human resources department and made disciplinary and termination decisions regarding Hanover employees, including Clouser.  (See id. ¶ 4).

According to the complaint, Clouser suffers from anxiety and depression. (See id. ¶ 7).  During an October 2020 meeting, Clouser alleges he notified his supervisor and vice president of operations, James Osborn, of his diagnoses.  (See id.)  He also notified Hanover's chief executive officer Jeff Warehime and a vice president of retail sales and marketing Russell Smith.  (See id.)  Over the next several weeks, Clouser experienced information technology ("IT") issues at work. (See id. ¶ 8).  On October 26, he "lost his domain administration access."  (See id.) After inquiring into the reason for his loss of access, Clouser learned he had been mistakenly removed as an administrator because he no longer worked in human resources.  (See id. ¶¶ 9-10).  Clouser's access was restored two days later.  (See id. ¶ 12).  On November 15, Clouser and a systems administrator named Mike Frazier performed IT maintenance.  (See id. ¶¶ 14-16; Doc. 1-7).  The pair encountered some trouble during the maintenance, and the complaint alleges Frazier attempted to blame Clouser for these IT problems.  (See id. ¶¶ 16-18).

On November 20, 2020, Clouser attended a meeting with Osborn and Kleinfelter.  (See id. ¶ 20).  During the meeting, Osborn and Kleinfelter placed Clouser on a performance improvement plan ("PIP") for "not communicating with Mr. Osborn that [Clouser] would be helping with IT projects."  (See id. ¶ 21).  They also issued Clouser a three-day unpaid suspension to begin the following week.

(See id. ¶ 22).  They further informed Clouser he would be receiving a new job title and reporting to James Hernandez, Director of IT.  (See id. ¶¶ 8, 21).

Following the meeting, Osborn purportedly informed Clouser that Kleinfelter "pushed" to have Clouser suspended.  (See id. ¶ 23).  Clouser also alleges that news of the unpaid suspension exacerbated his anxiety and depression, and that he "notified his supervisors of the same."  (See id. ¶ 22).  Clouser sent several emails after the meeting to Osborn, Kleinfelter, and Warehime, believing he had become "a scape[]goat for any negative issues" and that Hanover's IT department "had become a hostile work environment."  (See id. ¶ 24).

Clouser alleges he took several actions during his November 2020 suspension.  He contacted the Department of Labor ("DOL") about the fact that his suspension was unpaid.  (See id. ¶ 25).  Clouser avers DOL "provided him with documentation" stating that Hanover was "not permitted to withhold pay" from him.  (See id.)  Clouser also contacted the Equal Employment Opportunity Commission ("EEOC") to file a charge about "discrimination and hostile work environment," although the complaint does not provide further details about this charge.  (See id. ¶ 26).  Additionally, Clouser alleges he filed a complaint with the Occupational Safety and Health Administration ("OSHA") to inform the agency of "unsafe conditions" in four Hanover plants in Pennsylvania and spoke with a Hanover safety manager about the same.  (See id. ¶¶ 26-27).

According to the complaint, Clouser attended another meeting with Osborn and Kleinfelter when he returned to work on December 4, 2020.  (See id. ¶ 28).

Clouser allegedly "raised his former complaints . . . regarding a hostile environment," and stated the timing of his suspension was "suspicious" and had "caused him further anxiety." (See id.) Clouser also complained to Kleinfelter about being "ridiculed due to his base of knowledge regarding various IT issues," and provided her with information and paperwork from DOL about his unpaid suspension. (See id. ¶ 32). Clouser alleges Kleinfelter "grabbed the paper out of [his] hand" and stated, "I should fire you; you're getting off pretty lucky and if I can find a way to fire you I will." (See id.)

Clouser then began his new job duties in the IT department, working under Hernandez and focusing on creating a new website. (See id. ¶ 34). Clouser allegedly informed Hernandez and Osborn he was worried about getting "thr[own] under the bus" in his new position. (See id.) The complaint details several meetings during December 2020 and January 2021 in which Clouser allegedly perceived "a hostile situation and environment," little support or attention from his superiors, and his exclusion from "important conversations" that could affect his job. (See id. ¶¶ 36-40). On January 12, Osborn emailed Clouser with several tasks he wanted Clouser to prioritize. (See id. ¶ 41). Clouser "responded with a review of the IT department[']s poor communication, hostile work environment, and poor leadership." (See id.) Clouser avers that after he sent this email, he was "told to just shut up and do his job." (See id.)

The complaint alleges that on January 15, 2021, Clouser received approval from Hernandez to work from home part-time. (See id. ¶ 42). Clouser allegedly

needed to work from home "due to childcare needs and because of his anxiety."
(See id.)  The following week, Clouser attended a meeting to follow up on his PIP
with Hernandez, Osborn, and director of human resources Chuck Muzzy.  (See id.
¶ 43).  Clouser avers he "met all expectations of work," but that his January 12 email
to Osborn about the IT department was also a point of discussion.  (See id.)

Clouser continued working from home part-time without incident for several
weeks.  (See id. ¶ 44).  On February 9, 2021, Clouser informed Hernandez he still
needed to work from home "until he could find a daycare solution," and also "raised
the issue of stress and anxiety . . . due to the prior hostilities at work."  (See id.)
Hernandez allegedly responded that Clouser's working from home "was not a
problem," and reiterated this sentiment to Clouser via telephone on February 12,
2021.  (See id. ¶¶ 44-45).  The complaint also avers that Ellen Snyder, a female
coworker in his department, was permitted to work from home for 8-10 months due
to concerns about the COVID-19 epidemic and her ill husband.  (See id. ¶ 60).
However, Hernandez emailed Clouser on February 24, 2021, stating he believed
Clouser's work-from-home arrangement "was a temporary solution," and noted he
had not informed anyone that Clouser was working remotely.  (See id. ¶¶ 46-47).
Clouser was informed he needed to return to the office by the following Monday,
March 1, 2021.  (See id. ¶ 48).  He purportedly responded by requesting leave
pursuant to the FMLA "due to his health and the family crisis," but neither
Hernandez nor anyone else in Hanover's leadership provided him with any FMLA
paperwork.  (See id.)

On Friday, February 26, Clouser received an email with an attached letter from Muzzy titled: "Unpaid Leave of Absence – March 1st through March 5th Return to Work – March 8th." (See id. ¶ 49; Doc. 1-16). The email stated Clouser had no paid time off available to use, and that "there [was] no leave to which [Clouser was] entitled under this set of circumstances." (See Doc. 1-16 at 3). However, the letter offered Clouser one week of unpaid leave "to address [his] childcare situation," and noted he would be required to return to the office on March 8, 2021, or face disciplinary action, including discharge. (See id. at 3; Doc. 1 ¶ 49). Clouser allegedly responded by requesting FMLA paperwork a second time and newly requesting worker's compensation for a carpal tunnel injury that he "had been complaining to HR about since 2019." (See id. ¶ 50). He later informed Hanover that he "did not wish to take unpaid leave" because he was able to work from home. (See id. ¶ 51).

At some point between February 26 and March 8, Clouser's work email account was allegedly suspended. (See id. ¶ 51). Clouser avers he continued to communicate with Hanover about his worker's compensation claim through his personal email account. (See id.) On March 8, (the date Clouser was due back in the office), he emailed Osborn, Hernandez, Smith, and Muzzy around 6:15 a.m. to inform them he would be taking the day off because he was unable to obtain childcare and had a worker's compensation appointment that afternoon. (See id. ¶ 52). Clouser alleges he received no response. (See id.) Around 4:00 p.m., Clouser received a call from Osborn, Hernandez, and Muzzy, who informed him that due to

his absence from work, Hanover was terminating his employment.  (See id. ¶¶ 54-55).  Clouser avers his termination "was at the sole direction of" Kleinfelter.  (See id. ¶ 55).

Following his termination, Clouser filed a second EEOC charge on April 19, 2021.  (See id. ¶ 61; Doc. 1-19 at 2).  After he received a right-to-sue letter from the EEOC, Clouser initiated the instant lawsuit two months later, alleging employment discrimination and wrongful discharge under state and federal law.  Defendants filed a partial motion to dismiss pursuant to Rule 12(b)(6).  The motion is fully briefed and ripe for disposition.

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry. <u>See</u> <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" <u>Id.</u> at 130 (alteration in original) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. <u>Id.</u> at 131-32; <u>see</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 556); <u>Twombly</u>, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.

## III.   <u>Discussion</u>

Defendants move to dismiss 13 of the 16 claims in Clouser's complaint: Counts 1 and 4 (PHRA and ADA discrimination), Counts 2 and 5 (PHRA and ADA hostile work environment based on disability), Count 3 (PHRA retaliation based on disability), Count 7 (FMLA interference), Counts 9 through 14 (Title VII and PHRA discrimination, hostile work environment, and retaliation based on sex), and Count 15 (wrongful discharge in violation of Pennsylvania public policy due to food safety reports). They do not seek to dismiss Count 6 (ADA retaliation), Count 8 (FMLA retaliation), or Count 16 (wrongful discharge in violation of Pennsylvania public policy due to worker's compensation claim). As Clouser's claims under the PHRA

all hinge on the same procedural issue, we will address those claims first, followed by the remaining claims *seriatim*.

A.      **PHRA Claims**

The PHRA makes it illegal for an employer "because of the . . .sex, . . . or disability . . . of any individual[,] . . . to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions[,] or privileges of employment." See 43 PA. STAT. AND CONS. STAT. ANN. § 955(a).  A plaintiff filing suit under the PHRA must first file an administrative complaint with the Pennsylvania Human Rights Commission ("PHRC").  See id. §§ 959(a), 962.

It is beyond peradventure that an aggrieved employee in Pennsylvania is "bound exclusively to the PHRA's procedures, including the exhaustion of administrative remedies."  See Harrison v. Health Network Lab'ys Ltd., 232 A.3d 674, 683 (Pa. 2020); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997) (collecting cases).  A plaintiff who files with the PHRC "may not file an action in court for a period of one year."  See Burgh v. Borough Council of Montrose, 251 F.3d 465, 471 (3d Cir. 2001).  Following the one-year period, a plaintiff may file suit under the PHRA "regardless of whether or not he has received a letter from the PHRC."  See id. at 471.  But a plaintiff may not bypass the PHRA administrative process.  See Clay v. Advanced Comput. Applications, Inc., 559 A.2d 917, 920 (Pa. 1989) (noting "the statutory scheme would be frustrated if aggrieved employees

were permitted to circumvent the PHRC by simply filing claims in court"); <u>Vincent v. Fuller Co.</u>, 616 A.2d 969, 974 (Pa. 1992) (same).

Plaintiffs who seek federal and state remedies may simultaneously file claims with the EEOC and PHRC using a process often referred to as dual filing or cross filing. <u>See</u> <u>Woodson</u>, 109 F.3d at 926 n.12. When the EEOC has entered a worksharing agreement with the relevant state or local "fair employment practice agency," a plaintiff who wishes to dual file can allow one agency to process the claim, and the other to adopt the primary agency's findings. <u>See</u> 29 C.F.R. § 1626.10(a); <u>see also</u> <u>Woodson</u>, 109 F.3d at 926. Importantly, however, "EEOC procedures are not a sufficient surrogate for PHRC remedies." <u>See</u> <u>Woodson</u>, 109 F.3d at 927. In other words, a plaintiff who files *only* with the EEOC may not rely on the federal-state worksharing agreement as indicative of administrative exhaustion under the PHRA. <u>See</u> <u>id.</u> at 926-27; <u>see also</u> <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 165 (3d Cir. 2013) (citation omitted).

In the matter *sub judice*, defendants seek dismissal of the PHRA claims raised in Counts 1-3 and 12-14, arguing Clouser has failed to exhaust his administrative remedies because he filed suit less than a year after filing a charge of discrimination with the EEOC. (<u>See</u> Doc. 9 at 12-13). Upon review of the complaint and its attachments, we agree. The complaint does not allege that Clouser ever filed a complaint with the PHRA, or that his EEOC charges were dual filed. (<u>See</u> Doc. 1 ¶¶ 26, 61) (alleging only that Clouser filed charges with the EEOC)). Nor does Clouser's April 2021 right-to-sue letter from the EEOC, attached as an exhibit to his

complaint, mention PHRC dual filing.  (See Doc. 1-19); see also Woodson, 109 F.3d

at 926 n.12.  Assuming *arguendo* Clouser dual filed in April 2021, he still filed suit

less than a year after he filed his administrative charge.  Cf. Burgh, 251 F.3d at 471.

However, we consider Clouser's failure to allege facts related to any PHRC filing to

be factual in nature and capable of being cured.  See Fletcher-Harlee Corp. v. Pote

Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007).  We will therefore

dismiss his PHRA claims without prejudice and with leave to amend.[1]

### B.    ADA & Title VII Claims

#### 1.    *ADA Discrimination*[2]

The ADA mandates that an employer may not "discriminate against a

qualified individual on the basis of disability."  See 42 U.S.C. § 12112(a).  To state a

*prima facie* claim of discrimination under the ADA, a plaintiff must allege (1) he has

---

[1] Defendants argue in the alternative that Clouser's PHRA claims fail "for the same reasons . . . that his ADA and Title VII claims fail."  (See Doc. 9 at 12 n.2).  Our court of appeals interprets the PHRA as "identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently."  See Jones v. SEPTA, 796 F.3d 323, 327 (3d Cir. 2015) (citation and quotation marks omitted); see Colwell v. Rite Aid Corp., 602 F.3d 495, 499 n.3 (3d Cir. 2010) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (ADA)); Connelly v. Lane Constr. Corp., 809 F.3d 780, 791 n.9 (3d Cir. 2016) (retaliation).  Our analysis *infra* with respect to Clouser's ADA and Title VII claims applies equally to his parallel PHRA claims.

[2] Clouser's claims appear to implicate both discrimination and failure-to-accommodate theories.  (See Doc. 1 ¶¶ 82-87).  A failure-to-accommodate claim also requires the plaintiff to allege he has a disability.  See Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017) (listing elements).  Defendants challenge the sufficiency of Clouser's factual allegations of a disability.  (See Doc. 9 at 14-18).  Because this deficiency would also apply to any failure-to-accommodate claim, we will not address that theory separately.

a disability, (2) he is a "qualified individual," and (3) the defendant discriminated against him because of his disability.  See Eshelman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2019) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).  Although, "a complaint need not establish a *prima facie* case in order to survive a motion to dismiss[,]" a plaintiff must still aver "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements."  See Connelly v. Lane Const. Corp., 809 F.3d 780, 788-89 (3d Cir. 2016) (internal quotation omitted).  Defendants challenge the factual sufficiency of the claims, arguing Clouser has not alleged a disability or any facts to infer a connection between his disability and termination.  (See Doc. 9 at 14-18).

Clouser alleges he requested to work remotely due to anxiety and was terminated within only a few weeks of the request.  (See Doc. 1 ¶¶ 44, 47, 52-55). These allegations meet the pleading standard for stating a causal link between Clouser's anxiety and his termination.  See Connelly v. Lane Const. Corp., 809 F.3d 780, 788 (3d Cir. 2016).  However, whether Clouser avers sufficient facts suggesting his anxiety qualifies as a disability under the ADA is a closer question.

Under the ADA, a person has a disability if he has "a physical or mental impairment that substantially limits one or more major life activities," or has "a record of such an impairment," or is "regarded as having such an impairment." See 42 U.S.C. § 12102(1).  Major life activities include, *inter alia*, learning, concentrating, thinking, communicating, interacting with others, and working.  See id. § 12102(2)(A); 29 C.F.R. § 1630.2(i).  Federal regulations clarify that an

impairment "substantially limits" a major life activity if it "limits the ability of an individual to perform a major life activity as compared to most people in the general population." See 29 C.F.R. § 1630.2(1)(ii); see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 185 (3d Cir. 2010). According to the statute, the definition of disability "shall be construed in favor of broad coverage." See 42 U.S.C. § 12102(4)(A). But a diagnosis standing alone is not sufficient to establish a disability without factual allegations about impairment of a plaintiff's major life activities. See Bialko v. Quaker Oats Co., 434 F. App'x 139, 142 (3d Cir. 2011) (nonprecedential) (citation omitted).

Upon review of the complaint, the court concludes Clouser has not sufficiently alleged a disability that substantially limits any major life activities. He alleges that he faces "anxiety and depression," but provides no factual averments suggesting these diagnoses substantially impair him. (See Doc. 1 ¶ 7). Clouser also avers that his suspension and placement on a PIP "caused and/or exacerbated" his anxiety and depression, but the existence of a mental health diagnosis, standing alone, does not suggest any resulting substantial limitation. (See id. ¶¶ 22, 28). In short, the complaint contains no allegations at all about how Clouser's conditions limit his major life activities. We thus conclude the complaint lacks the requisite factual allegations to establish Clouser was a qualified individual with a disability. See Bialko, 434 F. App'x at 142. These deficiencies are factual in nature, and they are capable of being cured. See Fletcher-Harlee Corp., 482 F.3d at 252. We will grant the motion to dismiss Count 4 without prejudice and with leave to amend.

### 2.   *Title VII Discrimination*

Title VII makes it unlawful for an employer to "discriminate against any individual" due to sex.  See 42 U.S.C. § 2000e-2(a)(1).  To state a *prima facie* case of sex discrimination, a plaintiff must allege that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Plaintiffs may plead the final element by, *inter alia*, identifying a comparator, that is—a similarly situated individual outside plaintiff's protected class "who engaged in the same conduct but was treated more favorably."  See Mandel, 706 F.3d at 170 (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 358-59 (3d Cir. 1999)).

In the instant matter, defendants seek to dismiss Clouser's Title VII discrimination claim, arguing he has not pled sufficient facts about his alleged comparator.  (See Doc. 9 at 22-24).  Not so.  The complaint alleges that women who work for Hanover "are afforded childcare options when male employees are not." (See Doc. 1 ¶ 60).  Clouser further avers that Ellen Snyder, a woman "in the same department at Hanover" was permitted to work from home for 8-10 months due to COVID-19 concerns related to her ill husband, while he was fired soon after requesting to work from home due to COVID-19 and his resulting childcare obligations.  (See id.)  At the pleading stage, Clouser has met his burden to allege that Hanover treated a female coworker in his department more favorably, see

14

Mandel, 706 F.3d at 170, and has raised "a reasonable expectation that discovery will reveal evidence of the necessary elements," see Connelly, 809 F.3d at 788-89. We will deny the defendants' motion to dismiss Count 9 of the complaint.

### 3.    *ADA and Title VII Hostile Work Environment*

The ADA and Title VII both forbid an employer from discriminating against an employee on the basis of his protected class in relation to the "terms, conditions, and privileges of employment."  See 42 U.S.C. § 12112(a); 42 U.S.C. § 2000e-2(a)(1). Discrimination may alter the terms and conditions of employment when an employee's workplace "is permeated with discriminatory intimidation, ridicule, and insult."  See Komis v. Sec'y of U.S. Dep't of Lab., 918 F.3d 289, 293 (3d Cir. 2019) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)); see also Mandel, 706 F.3d at 167 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  To state a claim for hostile work environment, a plaintiff must allege (1) he suffered intentional discrimination because of his status in a protected class, (2) the discrimination was "severe or pervasive," (3) the discrimination "detrimentally affected the plaintiff," (4) this discrimination "would detrimentally affect a reasonable person in like circumstances," and (5) some basis for employer liability. See Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (Title VII); Walton v. Mental Health Ass'n, 168 F.3d 661, 667 (3d Cir. 1999) (ADA)).

Conduct must "alter the conditions of [the plaintiff's] employment and create an abusive working environment" to be deemed "severe or pervasive."  See Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Meritor

Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  The court inquires into whether

conduct in the work environment meets this standard by considering "the totality of

the circumstances, including: 'the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work

performance.'"  See Castleberry, 863 F.3d at 264 (quoting Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 23 (1993)).  Isolated incidents can create a hostile work

environment only if they are "extremely serious."  See id. at 264 (quoting Faragher

v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  Federal antidiscrimination laws do

not constitute "a general civility code," and "ordinary tribulations of the workplace"

do not give rise to a claim.  See Faragher, 524 U.S. at 788.

Defendants seek to dismiss Clouser's ADA and Title VII hostile work

environment claims because the complaint does not allege sufficiently "severe or

pervasive" mistreatment and that his allegations are unrelated to his sex or

disability.[3]  (See Doc. 8 at 18-21, 24-26).  We agree.  Clouser alleges the following:

Hernandez and Frazier "seemed threatened by" his placement in the IT

department, (Doc. 1 ¶ 12), Frazier attempted to "make any IT problems the fault of"

Clouser, (id. ¶ 18), Clouser believed the IT department "had become a hostile work

environment and people tried to utilize [Clouser] as a scape[]goat for any negative

---

[3] Defendants also argue Clouser's ADA claim should be dismissed due to the
lack of factual allegations regarding a disability.  (See Doc. 9 at 19).  We agree the
lack of allegations related to a disability is an independent basis on which to dismiss
Count 5.

16

issues," (id. ¶ 24), Clouser spoke out about being "ridiculed due to his base of knowledge regarding various IT issues," (id. ¶¶ 28, 32), Frazier and Hernandez created a "hostile situation and environment" during IT department meetings, (see id. ¶¶ 36-40), and when Clouser emailed Hernandez with details about the IT department's "poor communication, hostile work environment[,] and poor leadership," Clouser was "ridiculed, belittled, and ultimately told to just shut up and do his job," (see id. ¶ 41).  Clouser also alleges that after a December 2020 meeting with Osborn and Kleinfelter, he provided Kleinfelter paperwork from DOL regarding the impropriety of an unpaid suspension and Kleinfelter responded: "I should fire you; you're getting off pretty lucky and if I can find a way to fire you I will."  (See id. ¶ 32).  Finally, Clouser alleges Hanover treated a female coworker Ellen Snyder more favorably than male employees in relation to childcare and COVID-19 remote work. (See id. ¶ 60).

The problem with these allegations, save Clouser's reference to Ellen Snyder, is that they conspicuously lack any plausible nexus to either Clouser's sex or disability.  While the allegation about Snyder may give rise to a sex discrimination claim, it does not rise to the level of an "extremely serious" isolated incident that could lead to a hostile work environment.  Cf. Castleberry, 863 F.3d at 264.  Clouser claims his work environment was generally hostile, but avers no facts to indicate this hostility was based on his sex or disability—in other words, that his workplace was "permeated with *discriminatory* intimidation, ridicule, and insult."  Cf. Komis, 918 F.3d at 293 (emphasis added).  Without such a nexus between his protected

status and any mistreatment by coworkers or supervisors, Clouser's allegations merely describe "ordinary tribulations of the workplace."  See Faragher, 524 U.S. at 788; see also Walton, 168 F.3d at 667 (quoting Uhl v. Zalk Josephs Fabricators, Inc., 121 F.3d 1133, 1137 (7th Cir. 1997) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability.")).  These deficiencies are factual in nature, and they are capable of being cured.  See Fletcher-Harlee Corp., 482 F.3d at 252.  We will grant the motion to dismiss Counts 5 and 10 without prejudice and with leave to amend.

### 4.   *Title VII Retaliation*

Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  See 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must allege that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.  See Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 257 (3d Cir. 2017) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)).

Protected activity under Title VII includes an "opposition clause" and a "participation clause."  See Slagle v. County of Clarion, 435 F.3d 262, 265 (3d Cir. 2006) (citing statutory subsection); see also EEOC v. Allstate Ins. Co., 778 F.3d 444,

452 (3d Cir. 2015).  The protection offered by the opposition clause is narrower than that provided by the participation clause.  <u>Slagle</u>, 435 F.3d at 266.  A plaintiff may be protected by the opposition clause only when she "oppose[s] any practice made an unlawful employment practice" by Title VII.  <u>See</u> 42 U.S.C. § 2000e-3(a); <u>see also</u> <u>Moore</u>, 461 F.3d at 341.  The plaintiff's opposition "must identify the employer and the practice."  <u>Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.</u>, 450 F.3d 130, 135 (3d Cir. 2006).  Opposition of practices other than those prohibited under Title VII does not constitute protected activity.  <u>See</u> <u>Lamb-Bowman v. Del. State</u> <u>Univ.</u>, 39 F. App'x 748, 750-51 (3d Cir. 2002) (nonprecedential); <u>Hatcher v. Conifer</u> <u>Realty LLC</u>, No. 1:04-CV-1872, 2007 WL 3237518, at *4 (M.D. Pa. Oct. 30, 2007) (Conner, J.).  The plaintiff must also hold "an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute."  <u>Daniels v. Sch. Dist. of Phila.</u>, 776 F.3d 181, 193-94 (3d Cir. 2015) (quoting <u>Wilkerson v. New Media Tech. Charter Sch. Inc.</u>, 522 F.3d 315, 322 (3d Cir. 2008)).  In other words, "[t]he actions underlying the employee's conduct must be activity that Title VII was intended to protect."  <u>Rossell v. Cnty. Bank</u>, 270 F. App'x 217, 217 (3d Cir. 2008) (nonprecedential) (citing <u>Slagle</u>, 435 F.3d at 262).

Clouser alleges that he filed a charge with the EEOC in November 2020 during his 3-day suspension.  (<u>See</u> Doc. 1 ¶ 26).  Although the complaint does not indicate the basis for his 2020 EEOC charge, Clouser's action could qualify as protected activity pursuant to the participation clause.  <u>See</u> <u>Slagle</u>, 435 F.3d at 265.  Yet the complaint does not refer to this EEOC filing and instead avers Clouser

"engaged in protected activity (*i.e.*, reporting harassment due to his protected status) in 2021." (See Doc. 1 ¶ 36).  We therefore must consider whether Clouser's opposition activity identified the practice he opposed.  See Curay-Cramer, 450 F.3d at 135.  The complaint is devoid any facts alleging that Clouser opposed a specific employment practice that he believed constituted sex discrimination.  Nor does Clouser's briefing, which argues he has sufficiently alleged facts about Ellen Snyder for purposes of his Title VII discrimination claim, shed any light on the issue.  (See Doc. 10 at 13-14).  Assuming *arguendo* that Clouser in good faith believed Hanover's favorable treatment of Snyder constituted sex discrimination, he does not allege any facts to indicate that he voiced opposition to Hanover's practice.  Cf. Daniels, 776 F.3d at 193-94.  As we are unable to identify the factual allegations from 2021 that could give rise to protected activity under Title VII's opposition clause, we cannot examine the casual connection between Clouser's protected activity and adverse employment action.  We consider this a factual deficiency and will grant defendants' motion to dismiss Count 11 without prejudice and permit Clouser leave to amend.  See Fletcher-Harlee Corp., 482 F.3d at 252.

**C.    FMLA Interference Claim**

The FMLA accords eligible employees up to twelve weeks of leave during any twelve-month period for certain qualifying medical events.  See 29 U.S.C. § 2612(a)(1).  Courts recognize two distinct types of FMLA claims: (1) claims of interference with the existence of or the attempt to exercise substantive FMLA rights; and (2) claims of retaliation for exercise of those rights or for opposing

employer practices that violate the FMLA.  See Lichtenstein v. Univ. of Pittsburgh

Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012).  To plead a FMLA interference claim, a

plaintiff must allege that (1) he is an eligible employee under the FMLA; (2)

defendant is an eligible employer under the FMLA; (3) he was entitled to leave

under the FMLA; (4) he provided the defendant with adequate notice of his

intention to take FMLA leave; and (5) defendant denied or otherwise interfered

with plaintiff's FMLA rights.  See Ross v. Gilhuly, 755 F.3d 185, 191 (3d Cir. 2014)

(citations omitted).  A FMLA interference claim does not necessitate discriminatory

intent; it only requires a denial of benefits to which the employee is entitled.  See

Capps v. Mondelez Glob., LLC, 847 F.3d 144, 155 (3d Cir. 2017) (citing Callison v.

City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005)).

Construing the complaint in a light most favorable to Clouser, he has stated a

claim for FMLA interference.  Clouser allegedly requested FMLA leave on

February 24, 2021 "due to his health" and his inability to secure childcare, but never

received FMLA paperwork.  (See Doc. 1 ¶ 48).  On February 26, he purportedly

received a letter from Muzzy stating "there is no leave to which you are entitled,"

and offering Clouser one week of unpaid leave before returning to the office.  (See

Doc. 1-16 at 4).  Defendants argue Clouser fails to state a claim because he

"rejected" Hanover's February 25 offer of one week of unpaid leave before

returning to the office.  (See Doc. 9 at 21-22).  Yet the elements necessary to state a

claim for interference do not include an employee's ultimate acceptance of FMLA

leave, only that the employee provides notice of his intention to take such leave, and

the employer's denial of or interference with such leave.  See Ross, 755 F.3d at 191.

Furthermore, the February 26 letter from Muzzy does not seem to offer Clouser

FMLA leave at all—to the contrary, it states he is *not* entitled to leave.  (See Doc.

1-16 at 4).  At this procedural posture, we conclude the complaint sufficiently alleges

Clouser was denied or discouraged from using FMLA benefits to which he was

entitled, and he has stated a claim for FMLA interference.  See Capps, 847 F.3d at

155.  We will deny defendants' motion to dismiss Count 7.

### D.    Wrongful Discharge Claim

Clouser alleges he was terminated in retaliation for reporting safety

violations at Hanover facilities to OSHA.  Pennsylvania courts apply "an extremely

strong presumption" of at-will employment to all non-contractual employment

relationships.  See McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283,

287 (Pa. 2000); Geary v. U.S. Steel Corp., 319 A.2d 174, 175 (Pa. 1974).  Subject to few

exceptions, a common-law cause of action for wrongful discharge does not exist.

See Harrison v. Health Network Lab'ys Ltd. P'ships, 232 A.3d 674, 682 (Pa. 2020)

(citing Weaver v. Harpster, 601 Pa. 488, 501, 975 A.2d 555, 562-63 (Pa. 2009) (citing

Clay v. Advanced Comput. Applications, Inc., 559 A.2d 917, 918 (Pa. 1989))).  In

narrow circumstances, however, a claim for wrongful discharge may arise "where

the dismissal would threaten clear mandates of public policy."  See Shick v. Shirey,

716 A.2d 1231, 1234 (Pa. 1998) (citing Geary, 319 A.2d at 180).  The germane public

policy "must be applicable directly to the employee and the employee's actions."

See Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 175-76 (Pa. Super. Ct. 1996).

Pennsylvania courts recognize three limited circumstances where the dictates of public policy overcome the at-will presumption: the employer "(1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."  See Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003), as amended (Jan. 20, 2004) (quoting Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)).  But an employee who alleges he was terminated for complying with a statutorily imposed duty must have "a clear and direct affirmative duty" pursuant to the relevant law.  See Brennan v. Cephalon, Inc., 298 F. App'x 147, 151 (3d Cir. 2008) (nonprecedential) (no duty to report audit findings to FDA); but see Field v. Phila. Elec. Co., 565 A.2d 1170, 1180 (Pa. Super. Ct. 1989) (report to Nuclear Regulatory Commission "was statutorily required").  Furthermore, if a plaintiff claims wrongful discharge under Pennsylvania law by alleging that a *federal* statute has been violated, reference to the federal statute alone is insufficient.  See McLaughlin, 750 A.2d at 289 (employee who alleged termination due to her internal report of Occupational Safety and Health Act violations failed to state claim).  Instead, the plaintiff must allege that the *Commonwealth's* public policy "is implicated, undermined, or violated" by his termination.  See id.

According to the complaint, Hanover's termination of Clouser violated Pennsylvania public policy because Clouser "reported . . . information about food safety issues in the Hanover Foods Manufacturing Facilities," and  Hanover "was

required to be registered" under the Pennsylvania Food Safety Act, 3 PA. CONS.

STAT. §§ 5721-5737.  (<u>See</u> Doc. 1 ¶¶ 189-197).[4]  Defendants contend the

Commonwealth does not recognize a cause of action under these circumstances.

(<u>See</u> Doc. 9 at 27-28).  We agree with defendants.

Clouser alleges he filed a complaint with OSHA in November 2020 about

"unsafe conditions" in four of Hanover's Pennsylvania plants, and discussed these

issues with a safety manager at Hanover.  (<u>See</u> Doc. 1 ¶¶ 26-27).  Per Clouser,

because Hanover plants "were covered under" Pennsylvania's Food Safety Act, 3

PA. CONS. STAT. §§ 5721-5737, defendants' decision to discharge him contravenes

Pennsylvania public policy.  (<u>See</u> Doc. 1 ¶¶ 189-191).  Nowhere in Clouser's

complaint, however, does he allege he had a statutory duty to comply with any

reporting requirements under either the Occupational Safety and Health Act or the

Pennsylvania Food Safety Act, or that such a duty even exists.  <u>Cf.</u> <u>Fraser</u>, 352 F.3d

at 111; <u>Brennan</u>, 298 F. App'x at 151; <u>but see</u> <u>Field</u>, 565 A.2d at 1180.  Clouser

provides no indication that the Commonwealth's Food Safety Act was "applicable

directly to" Clouser and his employment within Hanover's IT department.  <u>Cf.</u>

<u>Hunger</u>, 670 A.2d at 175-76.  Clouser also does not allege defendants ever directed

---

[4] Clouser also makes passing reference to "Pennsylvania Food Safety guidelines and ethics, and . . . the Pennsylvania Constitution."  (<u>See</u> Doc. 1 ¶ 191). The complaint does not cite to any particular guideline, ethical rule, or constitutional clause, and Clouser does not refer to any in his opposition brief.  (<u>See</u> <u>generally</u> Doc. 10).  Thus, to the extent Clouser relies on any of them to state a claim for wrongful termination, he has abandoned those theories of recovery.  <u>See</u> <u>Stauffer v. Navient Sols., LLC</u>, 241 F. Supp. 3d 517, 519 n.3 (M.D. Pa. 2017) (Conner, C.J.) (plaintiff's lack of legal support in response to dispositive motion deemed withdrawal of claim).

him to commit any crime, nor does he point to any section of the statute that would make it illegal for defendants to terminate him.  Cf. Fraser, 352 F.3d at 111.

Clouser insists that his OSHA complaint, standing alone, allows him to state a claim because protecting employees who complain to OSHA constitutes Commonwealth public policy.  (See Doc. 10 at 14-15).  We do not find this argument persuasive.  The Pennsylvania Supreme Court's decision in McLaughlin makes clear that "it is a mistake to baldly point to a federal statute or administrative regulation and, without more, proclaim this as the public policy of the Commonwealth, such that every violation of any federal code, or statute becomes the basis for seeking a common law remedy against an employer."  See McLaughlin, 750 A.2d at 290.  In fact, the McLaughlin decision explicitly agreed with the proposition that "because OSHA is a federal law, we do not believe that this legislative scheme in itself provides any indication of a Pennsylvania state policy."  See id. at 289-90 (quoting Holmes v. Schneider Power Corp., 628 F. Supp. 937, 940 (W.D. Pa.), aff'd, 806 F.2d 252 (3d Cir. 1986) (employee failed to state a claim for wrongful discharge after he "complained to OSHA about welding fumes")).

We acknowledge but disagree with Clouser's citations to two Eastern District of Pennsylvania cases that allowed claims for wrongful discharge under Pennsylvania public policy for OSHA complaints.  (See Doc. 1 ¶ 193) (citing Sorge v. Wright's Knitwear Corp., 832 F. Supp. 118, 121 (E.D. Pa. 1993); Wetherhold v. Radioshack Corp., 339 F. Supp. 2d 670, 682 (E.D. Pa. 2004)).  We find the Sorge ruling inapposite because the decision predates the Pennsylvania Supreme Court's

decision in <u>McLaughlin</u>, which cited to but rejected <u>Sorge</u>'s underlying rationale. <u>See</u> <u>McLaughlin</u>, 750 A.2d at 289-90.  In <u>Wetherhold</u>, which postdates <u>McLaughlin</u>, the Eastern District considered whether an employee could state a claim for wrongful discharge after he filed a report with OSHA about possible black mold and mildew in his place of employment and was terminated less than a month later.  <u>See</u> <u>Wetherhold</u>, 339 F. Supp. 2d at 671-72.  There, the Eastern District court agreed with plaintiff's citation to the Pennsylvania Worker and Community Right-to-Know Act ("PWCRA"), which forbids employers from retaliating against employees who complain about hazardous substances in the workplace.  <u>See</u> <u>id.</u> at 678-80.  The court further observed that the PWCRA is to be construed in conjunction with "*any* provision of [f]ederal law" pertaining to hazardous substances.  <u>See</u> <u>id.</u> at 678-82 (emphasis added).  Emphasizing the PWCRA's anti-retaliation provision, and its construction with federal law, the court found plaintiff stated a claim for wrongful discharge.  <u>See</u> <u>id.</u>

The allegations giving rise to Clouser's complaint are distinguishable from <u>Wetherhold</u>.  Principally, the Food Safety Act Clouser cites to does not contain any language forbidding an employer from retaliating against an employee who reports a violation of its terms.  <u>Cf.</u> 3 PA. CONS. STAT. §§ 5721-5737.  The Food Safety Act states that it "shall be construed in a manner that is consistent with the [f]ederal acts" and their respective regulations, <u>see</u> 3 PA. CONS. STAT. § 5736, but its definition of "federal acts" does *not* include the Occupational Safety and Health Act, <u>see</u> 3 PA. CONS. STAT. § 5722.  Without a state law to anchor his federal OSHA

complaint, Clouser's reference to OSHA runs headlong into the ruling from McLaughlin that "a bald reference to a violation of a federal regulation, without any more articulation of how the public policy of this Commonwealth is implicated, is insufficient to overcome the strong presumption in favor of the at-will employment relation." See McLaughlin, 750 A.2d at 290. In short, the Commonwealth allows a claim for wrongful discharge in contravention of public policy "only in the clearest of cases," and the allegations of Clouser's complaint do not meet this stringent standard. See Weaver, 975 A.2d at 563. We will grant defendants' motion to dismiss the wrongful discharge claim alleged in Count 15 with prejudice.

## IV.   Conclusion

We will grant in part and deny in part defendants' motion (Doc. 6) to dismiss Clouser's complaint. An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    May 2, 2022